**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ABBOTT LABORATORIES, | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | )   No. 19 C 6587 |
| v. | ) |
| | )   Judge Sara L. Ellis |
| GRIFOLS DIAGNOSTIC SOLUTIONS INC., | ) |
| GRIFOLS WORLDWIDE OPERATIONS | ) |
| LIMITED, and NOVARTIS VACCINES | ) |
| AND DIAGNOSTICS, INC., | ) |
| | ) |
| Defendants/Counter-Plaintiffs. | ) |

**<u>OPINION AND ORDER</u>**

Abbott Laboratories ("Abbott") brought this declaratory judgment action against

Defendants Grifols Diagnostic Solutions Inc. ("Grifols Diagnostic"), Grifols Worldwide

Operations Limited ("Grifols Worldwide"), and Novartis Vaccines and Diagnostics, Inc.

("Novartis"), asserting that the claims of U.S. Patent No. 7,205,101 ("the '101 Patent") are

invalid. In response, Defendants filed a counterclaim asserting that Abbott infringes the '101

Patent.[1] The parties have now filed motions for summary judgment.[2]

Because the asserted claims are not directed to a patent-ineligible natural phenomenon,

the Court enters judgment for Defendants on Abbott's claim for declaratory judgment of

invalidity under 35 U.S.C. § 101 and Abbott's patent ineligibility defense. But the Court finds

---

[1] For simplicity, the Court does not refer to Defendants' additional designation as Counter-Plaintiffs.

[2] The parties filed their briefs and accompanying exhibits under seal, also providing redacted versions. If the Court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential. Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

that claims 1, 3, 7, and 10 of the '101 Patent are invalid for lack of a written description and as anticipated under § 102, leaving only claims 9 and 17 pending. Claims 9 and 17 are not invalid on the basis of obviousness-type double patenting. But Abbott's rpGO-11CKS, rpGO-9CK, HIV-1 rpCKS41, and rp41 HLH-M antigens do not infringe claims 9 and 17 under the doctrine of equivalents. To the extent that Defendants establish infringement of claims 9 and 17 based on Abbott's other products, they can only recover for those accused products that incorporate accused manufacturing steps performed in the United States after November 2, 2019. Finally, the question of Abbott's willfulness in any infringement remains for the jury.

## BACKGROUND[3]

### I.     Overview of the '101 Patent and the Asserted Claims

The '101 Patent, titled "Human Immunodeficiency Virus (HIV) Nucleotide Sequences, Recombinant Polypeptides, and Applications Thereof," relates to the diagnosis, prevention, and treatment of HIV, the virus that causes acquired immunodeficiency syndrome ("AIDS"). In particular, the '101 Patent provides a method for replicating HIV DNA. According to the '101 Patent, "the production of recombinant HIV proteins was not possible prior to the present invention." '101 Pat. at 2:30–31. The '101 Patent issued on April 17, 2007 and expires on April 17, 2024.

Defendants have accused Abbott of infringing claims 1, 3, 7, 9, 10, and 17 of the '101 Patent. Independent claim 1 recites:

A method for replicating DNA specific for HIV, which comprises:

---

[3] The Court derives the facts in this section from the Joint Statements of Undisputed Material Facts that the parties separately filed alongside each motion for summary judgment, as well as any additional facts presented by the parties in the briefing. The Court has included in this background section only those facts that are appropriately presented, supported, and relevant to resolution of the pending motions for summary judgment.

(a) providing a DNA construct comprising an origin of replication recognized by a unicellular microorganism and a DNA sequence comprising at least a 20 bp sequence of a human immunodeficiency virus (HIV) genome; and

(b) growing a unicellular microorganism containing said DNA construct under conditions whereby said DNA sequence is replicated.

*Id.* at 75:57–66. Claims 3, 7, 9, and 10 depend from claim 1 and provide as follows:

3. The method according to claim 1 wherein the DNA construct contains a env sequence of HIV.

7. The method of claim 1, 2 or 3 wherein the unicellular microorganism is a yeast cell.

9. The method of claim 1, 2, or 3 wherein the HIV sequence is an env sequence of FIG. 4.

10. The method of claim 1, 2, or 3 wherein the HIV sequence is at least 45 base pairs long.

*Id.* at 76:34, 13–14, 17–20. Independent claim 17 recites:

A method for replicating DNA specific for HIV, which comprises:

(1) providing a DNA construct comprising an origin of replication recognized by a unicellular microorganism and a DNA sequence comprising at least a 20 basepair sequence of a human immunodeficiency virus (HIV) env sequence as show in FIG. 4; and

(b) growing a unicellular microorganism containing the DNA construct under conditions whereby the DNA sequence is replicated.

*Id.* at 76:51–60. The Court held a *Markman* hearing on February 25, 2022 and issued its

claim construction order on April 27, 2022. The Court construed the disputed terms of the '101

Patent as follows:

| Claim Term | Construction |
|---|---|
| "a 20 bp sequence of a human immunodeficiency virus (HIV) genome"<br><br>('101 Patent, claim 1) | "a 20 base pair sequence of human immunodeficiency virus (HIV) genome" |
| "a env sequence of HIV"<br><br>('101 Patent, claim 3) | "a env sequence of HIV" |
| "A method for replicating DNA specific for HIV"<br><br>('101 Patent, claims 1 and 17) | Preamble is limiting |
| "DNA construct"<br><br>('101 Patent, claims 1, 3, and 17) | "a chimeric, human-made genetic structure that does not exist in nature" |
| "unicellular microorganism"<br><br>('101 Patent, claims 1, 7, and 17) | Plain and ordinary meaning |

Doc. 113 at 14.

## II. Priority Applications

Application No. 08/442,748 (the "'748 Application"), which was filed on May 17, 1995, led to the '101 Patent. The '748 Application is a divisional application of Application No. 08/089,407 (the "'407 Application"), which was filed on July 8, 1993, and issued as U.S. Patent No. 7,273,695 on September 25, 2007. The '407 Application itself is a continuation of Application No. 07/931,154 (the "'154 Application"), which was filed on August 17, 1992, but later abandoned. The '154 Application is a continuation of Application No. 07/138,894 (the "'894 Application"), filed on December 24, 1987. The '894 Application issued on October 20, 1992, as U.S. Patent No. 5,156,949 (the "'949 Patent"). The '894 Application is a continuation-in-part of Application No. 06/773,447 (the "'447 Application"), which was filed on September 6, 1985, but later abandoned. The '447 Application is a continuation-in-part of Application No. 06/696,534 (the "'534 Application"), which was filed on January 30, 1985, and also later

abandoned.  The '534 Application is a continuation-in-part of Application No. 06/667,501 (the

"'501 Application"), which was filed on October 31, 1984, and also later abandoned.

The '101 Patent claims priority to the '501 Application, the '534 Application, the '447

Application, the '894 Application, the '154 Application, and the '407 Application.  Dr. Paul

Luciw and Dr. Dino Dina, the named inventors of the '101 Patent, are the named inventors on all

of these applications.

## III.    The '501 Application

The '501 Application described methods for preparing target HIV DNA, making a DNA

construct comprising the HIV DNA, and growing a unicellular microorganism containing the

DNA construct such that the HIV DNA is replicated.  The '501 Application disclosed "a

substantially complete sequence of ARV-2, indicating the amino acid sequences for the open

reading frames for the individual genes" in Figure 4.  Doc. 144 ¶ 10.

During prosecution of the patent family to which the '101 Patent belongs, the applicants

stated that at the time of the '501 Application's filing, "the art clearly possessed all of the

knowledge and skill required to make the claimed DNA sequences, constructs, cells, and

polypeptides except for the 'novel aspects of [the] invention;' i.e., a coding sequence of an HIV

*gag* polypeptide," which the '501 specification provided.  *Id.* ¶ 47.  Dr. Dina and Dr. Luciw

similarly acknowledged that, prior to their invention, vectors used to clone HIV DNA, including

the vector that they used, were known in the field.  Dr. Luciw also acknowledged that most of

the replication systems and bacterial hosts identified in the '101 Patent were known in the field

before the filing of the '501 Application, as was molecular cloning from a bacterial host.  Other

patent applications from the same family explicitly acknowledged this, stating that "[c]loning

and expression in bacteria was a routine matter in October 1984," Doc. 136 ¶ 20, and that

"[b]efore October 31, 1984, scientists of ordinary skill routinely expressed heterologous genes whose sequence was known in a wide variety of expression systems, including bacteria, plants, yeast, insect cells, and mammalian cells," *id.* ¶ 21. And in prior litigation against Abbott in 1995, Grifols' predecessor, Chiron Corporation, admitted that at the time the '501 Application was filed, "the state of the art permitted ordinarily skilled scientists to routinely produce recombinant protein fragments of any desired length, and test them for immunoreactivity." *Id.* ¶ 22. Dr. Warner Greene, Defendants' technical expert, admitted that *E. coli* was a common bacterium used for cloning in the early 1980s, that cloning with an origin of replication was well known before 1984, and that it was typical in 1984 to clone the segments of a virus using a bacterial cell.

## IV. Inventors' Knowledge of HIV Isolates

At the time the '501 Application was filed on October 31, 1984, three groups had independently identified the suspected cause of AIDS. The Institut Pasteur group called its isolate lymphadenopathy-associated virus ("LAV"). The National Institute of Health group called its isolate human T-cell lymphotropic virus type III ("HTLV-III"). And the University of California San Francisco group called its isolate AIDS-associated retrovirus ("ARV"). But prior to the filing of the '501 Application, no one had published a DNA sequence corresponding to any virus later referred to as HIV, with the relationship among the various identified isolates remaining unknown. And at the time of filing, Dr. Dina and Dr. Luciw had only sequenced the ARV-2 isolate set forth in Figure 4.

To that point, the '501 Application stated:

> At the present time, it appears that the lymphadenopathy associated
> virus (LAV) and the AIDS associated virus (HTLV-III) are, if not
> the same virus, at least very similar. However, until it is shown
> that the RNA sequence of the retroviruses is the same and, more

6

> importantly, the expression products, more particularly, the
> envelope proteins, are the same, there can be no certainty that the
> two viruses are the same or strains of the same type of virus or
> potentially even different viruses. Furthermore, as additional
> retroviral isolates are obtained from other victims of progressive
> generalized lymphadenopathy (PGL) or AIDS or even
> asymptomatic individuals, it remains to be determined whether
> these viruses are the same or different, as well as their relationship.

Doc. 144 ¶ 8. The application further stated that it provided nucleotide sequences, "which are at
least in part specific for sequences present in retroviruses which have been variably referred to as
[LAV], [HTLV-III], and [ARV]," with the application referring generally to the virus as "human
T-cell lympotrophic retrovirus ([h]TLR)." *Id.* ¶ 9. The application noted that "[t]he hTLRs may
be shown to be of the same class by being similar in their morphology, serology, reverse
transcriptase optima and cytopathology." *Id.* Dr. Luciw testified that the close relationship
among ARV, LAV, and HTLV-III only became clear after the publication of the sequences for
each in early 1985.

At the time the '501 Application was filed, a person of ordinary skill in the art expected
that viruses, and particularly RNA viruses such as HIV, would have genetic variability. The
'501 Application acknowledged that "hTLR is highly polymorphic," meaning that "not only may
isolates vary by one or more point mutations, but even the passage of a single isolate may result
in variation in the progeny." *Id.* ¶ 13. The inventors of the '501 Application included a strategy
"for analyzing the various polymorphisms, using restriction enzyme analysis, whereby different
isolates can be related in accordance with different families." *Id.* ¶ 14. While they only had
sequenced the ARV-2 isolate set forth in Figure 4, Dr. Greene opined that, in 1984, the inventors
"expected the subsequent discovery of additional HIV isolates and strains and understood that
the HIV DNA replication method they invented could be used with those newly discovered HIV
isolates, variants, and/or strains." Doc. 147 ¶ 28.

7

The '101 Patent, which, like the '501 Application, only sets forth the nucleotide sequence of Figure 4, states that "HIV is an art-recognized family of viruses, e.g., HIV-1 and HIV-2." '101 Pat. at 6:10–11. HIV-2 is a different but related virus to HIV-1 that was discovered in 1986 and sequenced in 1987. *See id.* at 6:37–39 (HIV-2 "is a new class of the HIV family that is not a strain of HIV-1"). Among the applications to which the '101 Patent claims priority, HIV-2 was first mentioned in the '894 Application. Dr. Dina acknowledged that none of his work on the family of patents related to HIV-2. Dr. Luciw testified that he had only worked with HIV-1 at the time of the '501 Application but also had "possession of a method that could be tested for HIV-2," though he did not know if it would work. Doc. 147 ¶ 32.

## V. The Chang Patent

On May 1, 1984, several individuals, including Robert C. Gallo, published an article in Science titled "Detection, Isolation, and Continuous Production of Cytopathic Retroviruses (HTLV-III) from Patients with AIDS and Pre-AIDS." Subsequently, Nancy T. Chang, Robert C. Gallo, and Flossie Wong-Staal filed Application No. 06/693,866 on January 23, 1985. That application ultimately issued as U.S. Patent No. 9,328,391 (the "Chang Patent") on May 3, 2016. The Chang Patent, titled "Cloning and Expression of HIV-1 DNA," recites an HTLV-III sequence, which has at least 20 base pairs in common with the envelope of the Figure 4 sequence. Dr. Greene testified that the Chang Patent discloses all limitations of each of the asserted claims of the '101 Patent.

## VI. The '949 Patent

The '949 Patent is titled "Immunoassays for Antibody to Human Immunodeficiency Virus Using Recombinant Antigens." Claim 6 of the '949 Patent, which Abbott relies on for its obviousness-type double patenting defense, depends from claims 2 and 4. Claim 2 recites:

8

> A method of detecting antibodies to a human immunodeficiency
> virus (HIV) in a human sample comprising:
>
> a) providing a solid support having bound thereto a recombinant
> polypeptide comprising at least an immunogenic portion of the
> envelope (env) domain of said HIV, wherein said recombinant
> polypeptide is the expression product of cellular hosts transformed
> by a heterologous expression vector comprising a DNA sequence
> encoding said recombinant polypeptide under the control of
> transcriptional and translation initiation and termination regulatory
> sequences functional in said cellular hosts;
>
> b) contacting said solid support with said human sample to provide
> a sample-contacted support;
>
> c) washing said sample-contacted support to provide a washed
> support; and
>
> d) determining whether human antibodies are bound to said
> washed support.

'949 Pat. at 78:47–66. The Court construed the term "a recombinant polypeptide comprising at least an immunogenic portion of the envelope (env) domain of said HIV" as "a recombinant polypeptide comprising at least an immunogenic portion of at least 21 base pairs of the envelope (env) domain of HIV DNA." Doc. 113 at 14. Claim 4 recites: "The method claim 2 wherein said cellular hosts are microorganisms." '949 Pat. at 79:1–2. And Claim 6 recites: "The method of claim 4 wherein said microorganisms are *E. coli.*" *Id.* at 79:5–6. *E. coli* is a unicellular microorganism and a bacterial cell. The '949 Patent issued from the '894 Application. During prosecution of the '894 Application, on April 20, 1989, the U.S. Patent and Trademark Office ("USPTO") issued a restriction and species election requirement for originally filed claims 1–59 of the application. Specifically, the USPTO Examiner identified the following groups of claims contained in the application:

> I. Claims 1–12, 18 drawn to DNA constructs, classified in Class
> 435, subclass 320.

> II. Claims 13–17, drawn to DNA, classified in Class 536, subclass 27.
>
> III. Claim 19, drawn to a hybridization assay, classified in Class 435, subclass 5.
>
> IV. Claim 20, drawn to cloning DNA, classified in Class 435, subclass 243.
>
> V. Claims 21–26, drawn to cloning DNA, classified in Class 435, subclass 68.
>
> VI. Claims 27–52, drawn to methods of detecting antibodies, classified in Class 435, subclass 5.
>
> VII. Claims 53–54, drawn to polypeptides, classified in Class 530, subclass 300+.
>
> VIII. Claims 55–56, drawn to an article, classified in Class 435, subclass 5.
>
> IX. Claims 57–59, drawn to methods of producing antibodies and vaccines, classified in Class 424, subclass 89.

Doc. 129 ¶ 25. The Examiner further stated:

> [A]pplicants are required to limit the claims of the elected group to a single species, and make all claims readable thereon. Each of the DNA sequences, constructs and polypeptides are separately patentable, as they are drawn to different sequences having different properties.
>
> If applicants should select the methods of Group VI, they may additionally select the polypeptides of Group VII which are readable on the single selected species, and may also include any of the supports of Group VIII which are drawn to the same species.

*Id.* ¶ 26.

In response, the applicants stated:

> Applicants accept the restriction requirement, and in compliance therewith elect Group VI, drawn to methods of detecting antibodies (Claims 27–52).
>
> . . . .

> In addition to the above, Applicants accept the Examiner's
> suggestion, and elect the polypeptides of Group VII (claims 53–54)
> which are readable on the elected species, and the articles of Group
> VIII (claims 55 and 56) which are drawn to the same species.

*Id.* ¶ 27.  The applicants further indicated that they "elect polypeptides comprising segments of

the envelope region, including envelope polypeptides," *id.* ¶ 28, and "request that claims 1–26,

30–33, 42–45, and 57–59 be cancelled without prejudice," *id.* ¶ 29.  The applicants noted that

their "election of group and species does not constitute an abandonment of the non-elected

subject matter," reserving "the right to pursue the subject matter of the non-elected groups and

species in divisional applications."  *Id.*

On April 27, 1992, the Examiner issued a Notice of Allowability for the '894

Application, stating:

> Applicants were the first to realize the importance of utilizing
> recombinantly produced HIV envelope proteins as antigen
> standards in immunoassays for anti-HIV antibodies.  By generating
> the envelope proteins recombinantly it is possible to control for the
> high rate of mutation seen in these proteins when produced by
> virally infected cells.  This control results in improved assay
> results when compared with extant commercially available kits.

*Id.* ¶ 30.  The '949 Patent expired on October 20, 2009.

The specifications of the '101 and '949 Patents have many similarities.  They both

disclose the following:

> To produce recombinant polypeptides, expression vectors will be
> employed.  For expression in microorganisms, the expression
> vector may differ from the cloning vector in having transcriptional
> and translational initiation and termination regulatory signal
> sequences and may or may not include a replication system which
> is functional in the expression host.  The coding sequence is
> inserted between the initiation and termination regulatory signals
> so as to be under their regulatory control.  Expression vectors may
> also include the use of regulable promoters, e.g., temperature-
> sensitive or inducible by chemicals, or genes which will allow for
> integration and amplification of the vector and HIV DNA such as
> tk, dhfr, metallothionein, or the like.

'101 Pat. at 11:65–12:10; '949 Pat. at 12:21–35.  that "HIV DNA (either provirus or cDNA) may be cloned in any convenient vector." '101 Pat. at 11:49–50; '949 Pat. At 12:4–5.

Dr. David Ho, Abbott's technical expert, opined that "[f]or a host to be able to produce 'an immunogenic portion of the envelope (env) domain of said HIV,' the host must have the DNA sequence encoding said polypeptide, which is the env sequence of HIV."  Doc. 144 ¶ 62. He also opined that "for a cellular host to express the recombinant polypeptide, the cellular host must be grown under conditions whereby DNA is replicated."  *Id.* ¶ 63.  He further stated that "includ[ing] an origin of replication recognized by the host to allow the heterologous expression vector to replicate within said cellular host," as well as "includ[ing] an origin of replication in order to allow the heterologous expression vector to replicate in the cellular host, increasing the rate of production of the recombinant polypeptide," would be obvious.  *Id.* ¶¶ 64, 66. Additionally, Dr. Ho noted that a "'heterologous expression vector comprising a DNA sequence' is a DNA construct."  *Id.* ¶ 65.  On the other hand, Dr. Greene opined that "the shared specification of the '949 and '101 Patents explains that the expression vector and DNA construct are distinct and that individually, they may not have the same properties (i.e., regulatory signal sequences or an origin of replication)."  *Id.* ¶ 68.

When asked about the '949 Patent, Dr. Dina testified as follows:

> Q. The method to make the polypeptide described in Claim 2 [of the '949 Patent] is a method of replicating HIV, right?
>
> A. It relies on replicating the gene so that it can be transcribed and translated and generate the polypeptide needed.
>
> Q. Right.  When you are discussing the transcription and translation that is in Claim 2 to get the polypeptide, there is inherently the replication of DNA, per the cloning method [of the '101 Patent] we've been discussing today, right?
>
> A. That's what would typically happen if you use the right method.

> Q. And that would have been known to somebody of skill reading
> this recitation of transcription and translation, right?
>
> A. Yes.

Doc. 131 ¶ 38. Dr. Luciw testified that he thought that, in 1984, a person skilled in the art would

have understood the necessity of molecularly cloning HIV to obtain a recombinant technology

immunoassay to detect HIV.

## VII. The '748 Application

The applicants filed the '748 Application, which resulted in the '101 Patent, on May 17,

1995. The applicants refiled claims 1 and 20 of the '849 Application (part of Groups I and IV as

identified by the USPTO Examiner) as claims 1 and 20 of the '748 Application, which read as

follows:

> 1. A DNA construct comprising a replication system recognized by
> a unicellular microorganism and a DNA sequence coding for at
> least 20 bp of a human immunodeficiency virus (HIV) genome.
>
> 20. A method for cloning DNA specific for HIV, which comprises:
>
> (a) providing a DNA construct according to claim 1; and
>
> (b) growing a unicellular microorganism containing said DNA
> construct under conditions whereby said DNA sequence is
> replicated.

Doc. 129 ¶ 32. Upon issuance of the '101 Patent, originally filed claim 20, as amended, became

claim 1 of the '101 Patent.

During prosecution of the '748 Application, in an August 16, 1996 Office Action, the

Examiner provisionally rejected claim 1 as "claiming the same invention as that of claim 1 of

three other copending applications Serial Nos. 08/442,750, 08/443,077 and 08/443,434." *Id.*

¶ 39. In a later May 28, 1997 Office Action, the Examiner provisionally rejected pending claims

13

1, 60, 61, 62, 65, 69, and 70 under the doctrine of obviousness-type double patenting, stating as

follows:

> Claims 1, 61 and 70 remain provisionally rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 60 and 65 of copending Application No. 08/443,077. Although the conflicting claims are not identical, they are not patentably distinct from each other because they are both drawn to DNA constructs containing HIV *env* specific sequences.
>
> Claims 1, 60 and 69 remain provisionally rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claim 60 of copending Application No. 08/442,750. Although the conflicting claims are not identical, they are not patentably distinct from each other because they are both drawn to DNA constructs containing HIV *gag* sequences.
>
> Claims 1 and 62 remain provisionally rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claim 60 of copending Application No. 08/443,433. Although the conflicting claims are not identical, they are not patentably distinct from each other because they are drawn to DNA constructs containing *pol* sequences within the same restriction site boundaries.
>
> Claims 62, 65, 69, and 70 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

*Id.* ¶ 40. In a February 18, 1998 Office Action, the Examiner reasserted the same bases for the

provisional rejection of pending claims 1, 60, 61, and 62. In a September 8, 1998 Advisory

Action, however, the Examiner withdrew the obviousness-type double patenting rejections for

claims 1, 60, 61, 62, 65, 69, and 70. But the applicants nevertheless canceled pending claims 1,

60–62, and 69–71.

In a March 10, 1999 response to the same September 8, 1998 Advisory Action, the

applicants addressed an obviousness rejection of claims 20, 63–68, and 72–74 based on Levy

(U.S. Patent No. 4,716,102) and Manzari *et al.* (*Proc. Natl. Acad. Sci. U.S.A. 80*, 1574, 1983).

14

Levy disclosed an ARV-2 retrovirus and a deposited cell line infected with ARV-2, while Manzari taught a method of using degenerate primers to clone retroviral sequences of the HTLV-1 retrovirus. The applicants sough to differentiate Levy and Manzari by pointing out that ARV-2 is not an HTLV-I virus and so an ordinary artisan would not have concluded that a combination of the two would achieve success. The applicants further stated that, "even if *arguendo* the amino acid sequences of ARV-2 proteins were similar to those of HTLV-I proteins, nucleotide sequences which encode the ARV-2 proteins, which are required to practice Applicants' claimed method, are not obvious as a matter of law." Doc. 152 ¶ 30.

Separately, in a May 28, 1997 Office Action, the Examiner rejected claims 62 and 65 under 35 U.S.C. § 112's first paragraph "as containing subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor(s), at the time the application was filed, had possession of the claimed invention." Doc. 144 ¶ 37. In a November 26, 1997 response, the applicants disagreed with the Examiner's written description and enablement rejections, among others. They noted that "the HIV strain sequenced in the '501 Application actually has a very high homology with other HIV strains and its sequence is the closest to the consensus sequence of known HIV strains." *Id.* ¶ 38. They further stated that "[b]ased on the teaching and the sequence information provided by the '501 specification, it was well within the ability of one skilled in the art to obtain sequences of different HIV strains." *Id.* ¶ 39.

Nonetheless, in a February 10, 1998 Office Action, the Examiner rejected claims 1, 20, 60, 61, 62, 63, 64, 66–68, and 71 under 35 U.S.C. § 112's first paragraph. In an August 17, 1998 response, the applicants further disagreed with the rejection, stating that once they had cloned and sequenced the ARV-2 virus, "it was well within the ability of the skilled artisan to use the

15

teachings in the '501 specification to obtain sequences of different HIV strains." *Id.* ¶ 41. They further noted that the '501 specification, by "disclosing the coding sequence of the ARV-2 genome and teaching how libraries can be constructed from which to obtain related sequences," "conveys the information that the DNA constructs used in the methods of Applicants' invention can contain HIV sequences other than ARV-2." *Id.* ¶ 42. In a September 8, 1998 Advisory Action, the Examiner withdrew the rejection of claims 1, 20, 60, 61, 63, 64, 66–68, and 71 under 35 U.S.C. § 112's first paragraph for failure to provide enablement for the creation of DNA constructs with sequences from other HIV strains. But no Office Action explicitly stated that the Examiner withdrew the written description rejection of these claims. Nonetheless, the USPTO issued a Notice of Allowance on October 2, 2006.[4]

## VIII. The 1996 HIV License

To resolve litigation between Abbott and Grifols' predecessor, Chiron, Abbott and Chiron entered into a patent license on August 16, 1996 (the "1996 HIV License"). The 1996 HIV License granted Abbott and its affiliates "a worldwide, nonexclusive right and license, without the right to sublicense, under Licensed Patents to make, have made, use, import, offer for sale and sell Licensed Products in the Field." Doc. 155 ¶ 14. The 1996 HIV License defines Licensed Products as "Products the making, having made, using, importing, offering for sale, or selling of which, but for the license granted hereunder, would infringe a Valid Claim of a patent included within Licensed Patents." *Id.* ¶ 16. The 1996 HIV License further defines "Products" as "reagents, compositions or kits suitable for use in carrying out a diagnostic assay." *Id.* ¶ 17. It also defines "Field" as "human antibody/antigen-binding immunodiagnostic assays for detection of HIV . . . or antibodies thereto." *Id.* ¶ 18. The 1996 HIV License included the '101

---

[4] The delay in issuance stems from the USPTO's suspension of the prosecution of the '101 Patent on May 5, 1999, pending the resolution of Interference No. 103,659.

Patent as a Licensed Patent from its issuance on April 17, 2007, until the termination of the license on November 2, 2019.

The '949 Patent expired on October 20, 2009. Nonetheless, Abbott continued to pay royalties under the 1996 HIV License after the expiration of the '949 Patent. It calculated royalties after the '949 Patent's expiration based on the timing and location of the sales of its HIV immunoassay products, not on the timing and location of the manufacture of any seed cell bank, master cell bank, working cell bank, cell paste, or antigen. Abbott paid royalties under the 1996 HIV License on the U.S. and Canadian sales of its HIV immunoassay products through March 31, 2018.

As an explanation for the cessation of payment, an Abbott employee, Beth Vrioni, testified that she told a Grifols employee, Andrea Meghrouni-Brown, on October 22, 2018, that Abbott had conducted an audit of its license agreements and determined that it did not practice the '101 Patent. Abbott thereafter wrote Grifols a letter on May 10, 2019, setting forth Abbott's position as to why it did not practice the '101 Patent or owe Grifols any royalties. Abbott instituted this lawsuit on October 3, 2019, and officially terminated the 1996 HIV License on November 2, 2019.

## IX. Alleged Infringing Actions

Defendants allege that Abbott has infringed claims 1, 3, 7, 9, 10, and 17 of the '101 Patent under 35 U.S.C. § 271(a). Specifically, Defendants allege that Abbott's manufacture of certain seed cell banks, master cell banks, working cell banks, and cell pastes (the "Accused Manufacturing Steps") used in making HIV antigens for its HIV immunoassays (the "Accused Products") infringe the asserted claims. Defendants seek damages for Abbott's alleged

17

infringement, specifically, a reasonable royalty based on Abbott's worldwide sales of Accused Products from November 2, 2019 through September 30, 2021.

The Accused Manufacturing Steps occurred both inside the U.S. and in Germany, but Defendants' experts did not differentiate them for purposes of their infringement analysis. Dr. Greene determined that the HIV-2 and HIV O antigens do not infringe claims 9 and 17 of the '101 Patent because the HIV-2 sequence is significantly different from the Figure 4 sequence and he could not identify seven amino acids that overlapped.[5] Dr. Greene nonetheless contended that certain steps in Abbott's manufacture of certain antigens infringe claims 9 and 17 under the doctrine of equivalents because they have seven consecutive amino acids that correspond to seven consecutive amino acids provided by the amino acid sequence in the envelope region of Figure 4 of the '101 Patent. But Dr. Greene acknowledged that knowing a sequence of seven amino acids does not necessarily predict the corresponding nucleic acids. The '101 Patent explains that "FIG. 4 is a complete nucleotide sequence of ARV-2, derived from partial sequences of several ARV clones. Corresponding amino acid sequences are indicated for the open reading frames of the individual genes." '101 Pat. at 4:42–45.

Abbott has maintained an SAP database since 2015, which contains inventory and manufacturing information related to the Accused Products. Before that time, Abbott used an MRP database to store this information. Abbott produced summary reports from these databases with some inventory and manufacturing information related to the Accused Products. Defendants' damages expert did not review any individual batch reports or Abbott's batch record databases.

---

[5] As such, Defendants do not claim that Abbott's HIV-2 and HIV O antigens infringe claims 9 and 17.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering Abbott's motions for summary judgment, the Court views all evidence in the light most

Case: 1:19-cv-06587 Document #: 196 Filed: 09/20/23 Page 20 of 51 PageID #:9761

favorable to Defendants, and when considering Defendants' motions for summary judgment, the Court views all evidence in the light most favorable to Abbott. *Id.*

## ANALYSIS

### I.    Patent Eligibility under 35 U.S.C. § 101

First, the Court addresses Defendants' motion for partial summary judgment of validity under 35 U.S.C. § 101. The Court previously denied Abbott's motion to dismiss based on its contention that claim 7 of the '101 Patent is invalid under § 101. Doc. 62. The Court concluded that Abbott had not demonstrated that claim 7 was directed to a patent-ineligible natural phenomenon. *Id.* Now, Defendants argue that the Court should reaffirm this conclusion based on the record developed during discovery, which they claim bolsters the Court's decision. Abbott, on the other hand, continues to argue that the asserted claims are directed to the HIV DNA disclosed in the '101 Patent, not to a novel method of replicating the HIV DNA.

Patent eligibility under 35 U.S.C. § 101 "is a question of law based on underlying facts." *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 749 (Fed. Cir. 2019). Abbott, which raises the § 101 challenge, bears the burden of proof. *Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 967 F.3d 1319, 1328 (Fed. Cir. 2020).

Section 101 of the Patent Act defines patentable subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. This provision, however, "contains an important implicit exception": "[l]aws of nature, natural phenomena, and abstract ideas" are not patentable subject matter. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 70 (2012) (citations omitted); *accord Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1374 (Fed. Cir. 2016); *In re BRCA1- and BRCA2-Based Hereditary Cancer Test Patent Litig.* ("*In re BRCA*"), 774 F.3d 755, 762–63 (Fed. Cir. 2014). At the same time, "an invention is not rendered ineligible for [a]

patent simply because it involves" one of these exceptions. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).

In *Alice* and *Mayo*, the Supreme Court set forth a two-part test "[t]o distinguish claims to patent-eligible applications of . . . natural phenomena from claims that impermissibly tie up such . . . phenomena." *Illumina*, 967 F.3d at 1324–25. For step one of the *Alice/Mayo* test, the Court asks whether the asserted claims are "directed to" a natural phenomenon. *Id.* If the answer is no, the Court ends its inquiry because the claims are patent eligible. *Id.* at 1329–30; *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1047 (Fed. Cir. 2016). But if the asserted claims are directed to a natural phenomenon, the Court must proceed to *Alice/Mayo* step two, where it "examine[s] whether the limitations of the claim apart from the . . . natural phenomenon, considered individually and as an ordered combination, 'transform the nature of the claim into a patent-eligible application.'" *Illumina*, 967 F.3d at 1324–25 (quoting *Alice*, 573 U.S. at 217). If so, the asserted claims are eligible for patenting; if not, the claims are invalid under § 101. *Compare, e.g.*, *CellzDirect*, 827 F.3d at 1050–52 (finding that even if the claims at issue were directed to a natural law, they would still be patent eligible under step two because they applied the natural law "to achieve a new and useful preservation process"), *with Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1376–78 (Fed. Cir. 2015) (finding that the claims at issue were not patent eligible because they were directed to naturally occurring phenomena (step one) and that practicing the claims did "not result in an inventive concept that transforms the natural phenomenon . . . into a patentable invention" (step two)).

"The step one 'directed to' inquiry focuses on the claim as a whole." *Athena*, 915 F.3d at 750. It asks whether the language of a patent claim, considered in light of the patent's specification, is directed to excluded subject matter, such as natural phenomena. *See TecSec,*

*Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020); *Roche Molecular Sys., Inc. v. CEPHEID*, 905 F.3d 1363, 1368 (Fed. Cir. 2019). It is not enough, however, "to merely identify a [natural phenomenon] underlying the claim;" the Court "must determine whether . . . the claim is 'directed to'" that phenomenon. *CellzDirect*, 827 F.3d at 1050. In answering this inquiry, the Court may consider "whether the claimed advance improves upon a technological process or merely an ineligible concept, based on both the written description and the claims." *Athena*, 915 F.3d at 750. The specification may also help the Court "understand 'the problem facing the inventor' and [] what the patent describes as the invention." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) (citations omitted). But even though the patent's written description informs the Court's understanding of a claim, *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020), the focus of the "directed to" inquiry remains on the language of the claim itself, *see Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020) ("The Supreme Court's cases focus on the claims, not the specification, to determine section 101 eligibility. . . . Similarly, we have repeatedly held that features that are not claimed are irrelevant as to step 1 or step 2 of the *Mayo/Alice* analysis."); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) (explaining, at step one, that "[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves").

At the pleading stage, the Court analyzed the question of patent eligibility under step one as it pertains to claim 7. Doc. 62 at 8–14. But nothing suggests that the Court's analysis of claim 7's eligibility under § 101 would differ for the remaining asserted claims.[6] Indeed, all of the asserted claims set forth a two-step method for replicating HIV-specific DNA. First, the

---

[6] Abbott acknowledged as much in its motion to dismiss with respect to claim 7, stating that "were Grifols to attempt to assert any other claims of the '101 patent, they too are invalid because they are 'substantially similar [to claim 7] and linked to the same' natural phenomenon and there is no need for the court to address each such claim individually given the representative nature of claim 7 on this issue." Doc. 54 at 10 n.2.

"providing" step provides a "DNA construct," which comprises (1) an origin of replication recognized by a unicellular microorganism, and (2) a DNA sequence comprising at least a 20 bp (base pair) sequence of HIV genome. Second, the "growing" step grows a unicellular microorganism containing the DNA construct under conditions whereby the HIV DNA sequence replicates.

Abbott contends that discovery has undermined the Court's prior eligibility analysis and revealed that the asserted claims are actually directed to natural phenomenon, specifically, the HIV DNA strain identified by the inventors in Figure 4. But Abbott relies on the same arguments the Court previously rejected, and none of the additional evidence it cites convinces the Court of the need to depart from its prior analysis. Nonetheless, the Court again addresses Abbott's arguments against patent eligibility here.

First, Abbott argues that the claims and prosecution history demonstrate that the asserted claims are directed to DNA sequences, which the Supreme Court has recognized as patent-ineligible matter. *See Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 580 (2013) ("[A] naturally occurring DNA segment is a product of nature and not patent eligible merely because it has been isolated."). Abbott points out that the only limitation that claims 3, 9, and 17 have beyond the other asserted claims involves the naturally occurring HIV DNA sequence to be replicated, with claim 3 requiring the DNA construct to contain a env sequence of HIV, '101 Pat. at 76:3–4, and claims 9 and 17 requiring the HIV sequence to be a env sequence of Figure 4, '101 Pat. at 76:17–18, 51–60. Abbott also highlights statements in the prosecution history that highlighted the HIV coding sequences as the applicants' "inventive contributions to the art." Doc. 144-8 at 75. But claims 3, 9, and 17, as well as the remaining asserted claims, do not purport to claim specific HIV DNA sequences. *See Illumina*, 967 F.3d at 1327–28 (rejecting

a similar argument where the claims were "not directed to the cell-free fetal DNA itself").

Instead, the asserted claims all recite a two-step method for replicating HIV-specific DNA that

requires the use of a DNA construct and a unicellular microorganism. Thus, the asserted claims

are not impermissibly "directed to" a particular HIV DNA sequence.

Abbott further argues that the method at issue here is not novel but rather conventional,

with the only inventive contribution the coding sequence identified in Figure 4, which, as already

discussed, is patent-ineligible. For example, Abbott points out that the specification refers to

"standard" or "conventional" procedures or techniques. *See, e.g.*, '101 Pat. at 20:1, 30:2–3,

53:21–24. It also points to Defendants' own statements acknowledging that the replication

process was routinely practiced and understood in 1984.

Initially, despite the use of conventional techniques, the specification makes clear that the

particular two-step method set forth in the asserted claims for replicating HIV-specific DNA

"was not possible prior to the present invention." *Id.* at 19:66–20:1; *see Myriad Genetics*, 569

U.S. at 595 ("Had Myriad created an innovative method of manipulating genes while searching

for the BRCA1 and BRCA2 genes, it could possibly have sought a method patent."). The

inventors of the '101 Patent believed that the method provided a solution to the problems

accompanying the then-existing processes of replicating HIV DNA, which included chronically

infecting immortalized cell lines with HIV *in vitro* and using tissue culture to produce HIV

polypeptides. '101 Pat. at 2:1–27; *see Illumina*, 967 F.3d at 1326, 1329 (finding method claims

patent eligible where they "achieve[d] more than simply observing that fetal DNA is shorter than

maternal DNA or detecting the presence of that phenomenon"); *CellzDirect*, 827 F.3d at 1048,

1050 (finding method claims patent eligible where they were "directed to a new and useful

method of preserving" cells and did not simply observe or detect the ability of the cells "to survive multiple freeze-thaw cycles").

Further, the Supreme Court has explained that the "novelty" of a claimed process "is of no relevance in determining whether the subject matter of the claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*, 450 U.S. 175, 188–90 (1981) ("The question therefore of whether a particular invention is novel is 'wholly apart from whether the invention falls into a category of statutory subject matter.'" (citation omitted)). As the Federal Circuit more recently explained, "the novelty or nonobviousness of the invention has little to no bearing on the question of what the claims are 'directed to'"; step one of the *Alice/Mayo* inquiry asks whether the claim is directed to a patent-ineligible concept "regardless of whether the prior art demonstrates that the [claim or] aspects of the claim are known, unknown, conventional, unconventional, routine, or not routine." *CardioNet*, 955 F.3d at 1372.

That said, the Federal Circuit has indicated that "[w]here claims of a method patent are directed to an application that starts and ends with a naturally occurring phenomenon, the patent fails to disclose patent eligible subject matter if the methods themselves are conventional, routine and well understood applications in the art." *Ariosa*, 788 F.3d at 1378; *see also CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371, 1376 (Fed. Cir. 2022) ("[A]dding 'conventional steps, specified at a high level of generality,' to a law of nature or natural phenomenon does not make a claim to the law or phenomenon patentable." (quoting *Mayo*, 566 U.S. at 82)). But here, because the asserted claims recite a method that (1) begins with the use of a human-made, non-natural DNA construct to initiate the replication of HIV DNA, and (2) ends with the presence of replicated HIV DNA in an environment where HIV DNA does not naturally replicate, the Court does not see how the asserted claims can be "directed to" a *natural* phenomenon. *Cf. Ariosa*, 788 F.3d at 1376

25

(finding that method claims that began and ended with a natural phenomenon were directed to naturally occurring matter).[7] Further, the fact that the subject matter of the claimed process, HIV DNA, may undergo replication in nature does not make the asserted claims "directed to" that ability. *See CellzDirect*, 827 F.3d at 1049 ("That one way of describing the [claimed] process is to describe the natural ability of the subject matter to *undergo* the process does not make the claim 'directed to' that natural ability."). Thus, Abbott's arguments concerning conventionality may show that the asserted claims do not deserve patent protection for other reasons, but they do not bear on whether the claim is directed to a patent-ineligible concept. *See Diehr*, 450 U.S. at 191; *CardioNet*, 955 F.3d at 1372.

Finally, in arguing for patent ineligibility, Abbott again relies on cases that involved method claims that used a law of nature, natural phenomenon, or mental process to detect or diagnose something. *See CareDx*, 40 F.4th at 1378 (claims "appl[ied] conventional measurement techniques to detect a natural phenomenon—the level of donor cfDNA and the likelihood of organ transplant rejection"); *Athena*, 915 F.3d at 750–51 (claimed advance "was only in the discovery of a natural law" (the relationship between certain naturally occurring autoantibodies and neurological disorders) and the additional recited method steps "only appl[ied] conventional techniques to detect that natural law"); *Roche*, 905 F.3d at 1371–72 (method claims were directed to a natural phenomenon because they disclosed a way to detect Mycobacterium tuberculosis ("MTB") based on the observation that the presence of certain naturally occurring nucleotides indicated the presence of MTB in a biological sample); *Genetic*

---

[7] This is not to say that the use of a man-made structure in a claimed method necessarily means the claim is directed to patent-eligible subject matter. As Abbott points out in its reply brief, the "use of a man-made molecule in a method claim employing standard techniques *to detect or observe a natural law* may still leave the claim directed to a natural law." *Athena*, 915 F.3d at 752 (emphasis added). But this principle does not apply here because the asserted claims do not use the human-made DNA construct or the unicellular bacterial cell "to detect or observe" a natural phenomenon.

26

*Techs.*, 818 F.3d at 1372–76 (claim recited a method for detecting a coding region of DNA based on the coding region's relationship with non-coding regions); *Ariosa*, 788 F.3d at 1376 (claims were "generally directed to detecting the presence of a naturally occurring thing or a natural phenomenon"); *In re BRCA*, 774 F.3d at 761–64 (method claims identified alterations of a gene by comparing two gene sequences, which constituted patent-ineligible abstract ideas or mental processes). The Federal Circuit has consistently held such "claims unpatentable as directed to ineligible subject matter." *Illumina*, 967 F.3d at 1325; *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 927 F.3d 1333, 1352–53 (Fed. Cir. 2019) (Moore, J., dissenting from denial of rehearing en banc) (citing, among other cases, *Athena*, *Roche*, *Genetic Technologies*, *Ariosa*, and *In re BRCA*); *CellzDirect*, 827 F.3d at 1048 (a claim is "directed to" a natural phenomenon when it "amount[s] to nothing more than observing or identifying the [phenomenon] itself"). But here, as already discussed, the asserted claims do not use a patent-ineligible concept to detect or diagnose anything; they provide a particular process for making copies of HIV DNA. This makes the asserted claims more akin to a method claim directed to the preparation or production of something, like the claims the Federal Circuit found patent eligible at step one in *Illumina* and *CellzDirect*. *See Illumina*, 967 F.3d at 1326–29 (finding that claims "directed to methods for preparing a fraction of cell-free DNA that is enriched in fetal DNA" were not directed to a natural phenomenon); *CellzDirect*, 827 F.3d at 1047–50 (finding that claims reciting methods for producing a desired preparation of preserved cells were not directed to a natural law).

In sum, the Court finds that its analysis of the *Alice/Mayo* inquiry remains the same even after discovery: the answer to step one is "no," Abbott has not demonstrated that the asserted claims of the '101 Patent are directed to a patent-ineligible natural phenomenon. Accordingly,

27

the Court does not need to reach step two of the *Alice/Mayo* inquiry and finds that the asserted claims are patent eligible under § 101. *Illumina*, 967 F.3d at 1329 ("[W]e conclude at step one of the *Alice/Mayo* test that the claims are not directed to a patent-ineligible concept, and we need not reach step two of the test."). The Court thus enters judgment for Defendants on Abbott's claim for declaratory judgment of invalidity under 35 U.S.C. § 101 and Abbott's patent eligibility defense.

## II.     Written Description Requirement and Anticipation

The Court next turns to Abbott's argument that the asserted claims of the '101 Patent are invalid under 35 U.S.C. § 112 for lack of an adequate written description. Section 112's written description provision requires that "the disclosure of the application relied upon reasonably convey[ ] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). Because Defendants claim a 1984 priority date based on the filing of the '501 Application, the Court considers whether the '501 Application discloses that the inventors had possession of the claimed method for replicating HIV DNA at the time they filed that application. *See Columbia Ins. Co. v. Simpson Strong-Tie Co.*, No. 2021-2145, 2023 WL 2733427, at *3 (Fed. Cir. Mar. 31, 2023) ("In a patent system which allows claim amendments and continuation applications long after an initial application is filed, the written description requirement serves an important purpose: to ensure that the patent owner may only exclude others from what they had actually invented *as of the priority date*."); *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 906 (Fed. Cir. 2018) ("For claims to be entitled to a priority date of an earlier-filed application, the application must provide adequate written description support for the later-claimed limitations.").

In considering Abbott's written description argument, the Court undertakes "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad*, 598 F.3d at 1351. "Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Id.*; *see also Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1337 (Fed. Cir. 2021) ("[T]he written description must lead a person of ordinary skill in the art to understand that the inventors possessed the entire scope of the claimed invention."). "A 'mere wish or plan' for obtaining the claimed invention is not adequate written description." *Centocor Ortho Biotech, Inc. v. Abbott Lab'ys*, 636 F.3d 1341, 1348 (Fed. Cir. 2011) (quoting *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997)). The Court considers "the extent and content of the prior art, the maturity of the science or technology, the predictability of the aspect at issue, and other considerations appropriate to the subject matter." *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005). "Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

Abbott argues that the '501 Application only discloses a single strain of ARV-2 in Figure 4 and so does not demonstrate that the inventors had possession of the claimed method to replicate *all* HIV DNA in 1984. Abbott contends that, instead, the inventors only had possession of a method for replicating HIV DNA as disclosed in Figure 4, with the applicability to other viruses unknown given the nascent understanding of HIV. For support, Abbott highlights language in the '501 Application that "until it is shown that the RNA sequence of the retroviruses [LAV and HTLV-III] is the same and, more importantly, the expression products,

29

more particularly, the envelope proteins, are the same, there can be no certainty that the two viruses are the same or strains of the same type of virus or potentially even different viruses." Doc. 144 ¶ 8. Further, Abbott points to the fact that HIV-2, a new class of the HIV virus, was only discovered in 1986 and sequenced in 1987, meaning that the '501 Application could not describe HIV-2. *See Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1255 (Fed. Cir. 2004) ("Because chimeric antibody technology did not even exist at the time of the 1984 filing, the record conclusively supports that the Chiron scientists did not possess and disclose this technology in the February 1984 filing."). Because the inventors did not know the entire realm of HIV DNA in 1984, Abbott maintains that their lack of ability to "distinguish . . . infringing methods from non-infringing methods" demonstrates a lack of written description. *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 926 (Fed. Cir. 2004).

Defendants, on the other hand, contend that because the '101 Patent claims a *method* for replicating DNA specific for HIV, Abbott's focus on the inventors' knowledge of HIV DNA sequences in 1984 is misplaced. Instead, Defendants argue that the inventors anticipated the discovery of new HIV variants, with the '501 Application setting forth how to replicate a confirmed HIV isolate "using the claimed method regardless of its classification." Doc. 169 at 9.

But the Court agrees with Abbott that the written description inquiry must take into account whether the '501 Application discloses that the inventors had possession of the claimed HIV DNA at the time of filing.[8] This follows the Federal Circuit's instruction in *University of Rochester* that, "[r]egardless whether a compound is claimed *per se* or a method is claimed that entails the use of the compound, the inventor cannot lay claim to that subject matter unless he

---

[8] This aligns with Defendants' arguments at claim construction that the preamble to the asserted claims addresses a fundamental feature of the invention and clarifies that the method at issue is specific for HIV. *See* Doc. 113 at 11–12. The Court agreed with Defendants that the preamble "reflects a fundamental characteristic of the invention: that the replication method applies only to HIV DNA and not DNA more generally." *Id.* at 12.

can provide a description of the compound sufficient to distinguish infringing compounds from non-infringing compounds, or infringing methods from non-infringing methods." 358 F.3d at 926; *see also Univ. of Rochester v. G.D. Searle & Co.*, 249 F. Supp. 2d 216, 228 (W.D.N.Y. 2003) ("Virtually any compound claim could be transformed into a method claim, however, simply by means of wording the claim in terms of a method of using the compound. . . . It means little to 'invent' a method if one does not have possession of a substance that is essential to practicing that method."), *aff'd*, 358 F.3d 916.

Thus, the Court turns to whether the '501 Application discloses that the inventors had possession of the entire scope of HIV DNA instead of just the isolate identified in Figure 4. *See Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1124 (Fed. Cir. 2008) ("[T]o satisfy the written description requirement for a claimed genus, a specification must describe the claimed invention in such a way that a person of skill in the art would understand that the genus that is being claimed has been invented, not just a species of the genus."). Defendants do not meaningfully contest that the inventors did not possess the entire scope of HIV DNA. Instead, they focus on the fact that the '501 Application explains how to identify an HIV isolate and then use the claimed method to replicate it. But Defendants improperly conflate the written description requirement with enablement. *Nuvo Pharms. (Ireland) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1382 (Fed. Cir. 2019) ("[T]he fact that an invention may be enabled does not mean it is adequately described, and vice versa."). Enablement "requires the specification to teach those skilled in the art how to make and use the claimed invention without undue experimentation," an inquiry "separate and distinct from the written description requirement." *Id.* While the '501 Application may satisfy the enablement requirement by teaching one skilled in the art how to obtain a new HIV isolate and replicate it,

this does not demonstrate that the inventors had possession of all potential HIV isolates in 1984.[9] *See id.* ("Teaching how to make and use an invention does not necessarily satisfy the written description requirement.").

Defendants also argue that Abbott improperly relies on post-priority date events, such as the discovery of HIV-2 and HIV-1 Group O. Admittedly, the written description requirement "is judged based on the state of the art as of the priority date," meaning that "evidence illuminating the state of the art subsequent to the priority date is not relevant to written description." *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1373–74 (Fed. Cir. 2017). But Abbott properly uses these post-priority date discoveries "to show that [the '501 Application] fails to disclose a representative number of species." *Id.* at 1374–75. In other words, the discovery of other HIV strains and types underscores the fact that the inventors' disclosure of one strain did not sufficiently describe HIV DNA as a whole, even notwithstanding the generic use of the term "hTLR" in the '501 Application. *See AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1300 (Fed. Cir. 2014) ("With the *written description* of a genus, however, merely drawing a fence around a perceived genus is not a description of the genus. One needs to show that one has truly invented the genus, *i.e.*, that one has conceived and described sufficient representative species encompassing the breadth of the genus. Otherwise, one has only a research plan, leaving it to others to explore the unknown contours of the claimed genus."); *Univ. of Rochester*, 358 F.3d at 923 ("[G]eneralized language may not suffice if it does not convey the detailed identity

---

[9] Because enablement is a distinct inquiry from the written description requirement, Defendants' argument that Abbott lost similar arguments related to enablement in *Chiron Corp. v. Abbott Laboratories*, No. C-93-4380, 1996 WL 209717 (N.D. Cal. Apr. 23, 1996), carries no weight. The *Chiron* court only addressed the question of enablement, not written description. *Id.* at *6 ("It may be that the *quantity* of experimentation necessary in 1984 to isolate any undisclosed HIV strain was extensive indeed, but given the declarations of the parties' experts as to the guidance provided by the patent, the presence of working examples, the state of the prior art, and the relative skill of those in the art, this court cannot conclude by clear and convincing evidence that the '949 Patent does not enable one skilled in the art to practice the invention with any HIV strain.").

of an invention."); *Regents of the Univ. of Cal.*, 119 F.3d at 1568 ("[A] generic statement such as 'vertebrate insulin cDNA' or 'mammalian insulin cDNA,' without more, is not an adequate written description of the genus because it does not distinguish the claimed genus from others, except by function. It does not specifically define any of the genes that fall within its definition. It does not define any structural features commonly possessed by members of the genus that distinguish them from others."). As the inventors acknowledged in the '501 Application, they did not know whether the other isolated viruses, LAV and HTLV-III, were "the same or strains of the same type of virus or potentially even different viruses." Doc. 144 ¶ 8. And even looking just at the inventors' possession of a method for replicating an isolate of HIV, Dr. Luciw, one of the inventors, acknowledged that in 1984, he possessed "a method that could be tested for HIV-2," but he did not know whether the method would work. Doc. 147 ¶ 32. With this testimony, Dr. Luciw all but admitted that the inventors did not have possession of the entire scope of the invention in 1984. *See Nuvo Pharms.*, 923 F.3d at 1380–81 ("Although inventor testimony cannot establish written description support where none exists in the four corners of the specification, it illuminates the absence of critical description in this case."); *see also Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1350 (Fed. Cir. 2013) ("At best, the 2000 application describes a roadmap for producing candidate alpha-amylase variants and then determining which might exhibit enhanced thermostability. A patent, however, 'is not a reward for the search, but compensation for its successful conclusion.' For that reason, the written description requirement prohibits a patentee from leaving it to the . . . industry to complete an unfinished invention.'" (omission in original) (quoting *Ariad*, 598 F.3d at 1353)).

Nonetheless, Defendants ask the Court to reject Abbott's written description arguments because the USPTO rejected them during the prosecution of the '101 Patent and Abbott has not

demonstrated that the USPTO erred. *See Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1360 (Fed. Cir. 1984) ("When an attacker simply goes over the same ground travelled by the PTO, part of the *burden* is to show that the PTO was wrong in its decision to grant the patent."), *abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011). Although the Examiner did not explicitly withdraw the written description rejection for the asserted claims, by allowing the '101 Patent's claims, the Examiner must have withdrawn it. *See Paperless Acct. v. Bay Area Rapid*, 804 F.2d 659, 663 (Fed. Cir. 1986) (rejections that are not repeated in subsequent office actions are considered withdrawn "as a matter of standard procedure"); MPEP 707.07(e) ("In taking up an amended application for action the examiner should note in every letter all the requirements outstanding against the application. Every point in the prior action of an examiner which is still applicable must be repeated or referred to, to prevent the implied waiver of the *requirement*."). Even so, because the Court remains "the final arbiter of patent validity," the Court "may take cognizance of, and benefit from, the proceedings before the patent examiner," but it does not "defer[ ] to the rulings of the patent examiner." *Quad Env't Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 876 (Fed. Cir. 1991). Therefore, the fact that the Examiner must have withdrawn the written description rejection does not require a finding of adequate written description, particularly given Abbott's arguments here and the fact that much of Defendants' defense to the written description rejection before the USPTO appears to have been focused, as here, on the enablement requirement. *See, e.g.*, Doc. 144 ¶¶ 41–42 (recounting the applicants' statements during the prosecution of the '101 Patent concerning how a skilled artisan could use the ARV-2 sequence to obtain related sequences).

Finally, Defendants maintain that, to the extent that the Court finds Abbott's position persuasive, it nonetheless fails with respect to claims 9 and 17, which expressly limit the method of replication to the HIV DNA sequence identified in Figure 4. Abbott disagrees, arguing that Defendants have taken the position that the HIV DNA sequence need not be the exact sequence identified, but instead only at least a 20 base pair match. This debate about infringement, however, does not change the fact that Abbott must admit that the inventors had possession of the HIV DNA sequence identified in Figure 4 in 1984, having framed their entire written description argument around the fact that the '501 Application only discloses this particular sequence of HIV DNA. Possession of the Figure 4 sequence allows for the identification of infringing and non-infringing methods. *See Univ. of Rochester*, 358 F.3d at 926 (to meet the written description requirement, the inventor must "provide a description of the compound sufficient to distinguish infringing compounds from non-infringing compounds, or infringing methods from non-infringing methods"). Thus, the Court concludes that, while the '501 Application does not provide a sufficient written description for the asserted claims that refer only generally to HIV DNA, the '501 Application does provide adequate written description for claims 9 and 17, the claims expressly limited to the HIV DNA sequence identified in Figure 4.

This does not end the inquiry, however. As Defendants point out, the Court's finding that the '501 Application does not include a sufficient written description for all but claims 9 and 17 does not automatically invalidate those claims but instead deprives them of the '501 Application's filing date. *See Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 21 F.4th 1362, 1369 n.6 (Fed. Cir. 2022) ("Both parties wrongly assume that, if the 2006 priority application lacks sufficient written description of the '405 patent's claims, those claims are invalid. If the 2006 priority application lacks sufficient written description for the '405 patent's claims, the

35

'405 patent's claims are not automatically rendered invalid; they are merely deprived of the 2006 priority date."), *vacated on other grounds on reh'g*, 38 F.4th 1013 (Fed. Cir. 2022). But Abbott further argues that subsequent applications also do not include sufficient written description, and that, to the extent they do, the '101 Patent is invalid as anticipated by the Chang Patent. The Court need only address the latter argument.

Section 102 provides that "[a] person shall be entitled to a patent unless . . . (e) the invention was described in . . . (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent." 35 U.S.C. § 102 (2002). "A prior art reference anticipates a patent if it discloses all the limitations of the claimed invention." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1304 (Fed. Cir. 2006). Defendants do not dispute that the Chang Patent discloses the limitations of every one of the asserted claims. Instead, they argue that Abbott's anticipation argument fails because the parties dispute the priority date for the asserted claims. But, as discussed above, only claims 9 and 17 can claim priority to the '501 Application's filing date. The Chang Patent was filed on January 23, 1985.[10] All of the remaining applications to which the '101 Patent claims priority were filed after this date. Thus, the Chang Patent serves as prior art for all but claims 9 and 17 and renders claims 1, 3, 7, and 10 invalid as anticipated under § 102. *See PowerOasis*, 522 F.3d at 1310 (affirming summary judgment of invalidity based on anticipation where asserted claims could not claim priority to earlier application because that application failed for lack of written description).

---

[10] The parties disagree as to whether the Chang Patent may claim an earlier priority date. The Court agrees with Abbott, however, that this dispute is not material given that the Chang Patent's application was filed before the '534 Application, the next application to which the '101 Patent claims priority.

III.    **Obviousness-Type Double Patenting**

Both sides have moved for summary judgment on Abbott's obviousness-type double

patenting defense. "The doctrine of obviousness-type double patenting is intended to prevent the

extension of the term of a patent by prohibiting the issuance of the claims of a second patent that

are not patentably distinct from the claims of the first patent."[11] *G.D. Searle LLC v. Lupin*

*Pharms., Inc.*, 790 F.3d 1349, 1351 (Fed. Cir. 2015); *see also Perricone v. Medicis Pharm.*

*Corp.*, 432 F.3d 1368, 1373 (Fed. Cir. 2005) ("Non-statutory, or 'obviousness-type,' double

patenting is a judicially created doctrine adopted to prevent claims in separate applications or

patents that do not recite the 'same' invention, but nonetheless claim inventions so alike that

granting both exclusive rights would effectively extend the life of patent protection.").

Obviousness-type double patenting is a question of law based on the underlying facts, which

Abbott must prove by clear and convincing evidence. *Otsuka Pharm. Co. v. Sandoz*, 678 F.3d

1280, 1290 (Fed. Cir. 2012); *In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1375 (Fed.

Cir. 2008).

Obviousness-type double patenting entails a two-step inquiry, with the Court first

construing the claims in both patents and determining their differences. *Eli Lilly & Co. v. Barr*

*Lab'ys, Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001). The Court then considers whether the

---

[11] 35 U.S.C. § 121 provides a safe harbor to protect certain patents from invalidation based on obviousness-type double patenting. *See* 35 U.S.C. § 121 ("A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application."). But Defendants cannot and do not attempt to take advantage of the safe harbor provided by § 121, recognizing that they cannot do so because the '949 Patent issued in October 1992, several years before the filing of the '748 Application in 1995, and the '748 Application was not designated as a divisional application of the '894 Application. *See In re Janssen Biotech, Inc.*, 880 F.3d 1315, 1323 (Fed. Cir. 2018) ("For a challenged patent to receive safe-harbor protections, the application must be properly designated as a divisional application, at the very latest, by the time the challenged patent issues on that application.").

differences in the subject matter of the claims in the two patents render them patentably distinct.

*Id.* Here, the Court applies the one-way test for obviousness-type double patenting, asking

whether claims 9 and 17 of the '101 Patent are obvious over claim 6 of the '949 Patent.[12]  *In re*

*Berg*, 140 F.3d 1428, 1432 (Fed. Cir. 1998).  "If the [later] claim defines *more* than an obvious

variation, it is *patentably distinct*."  *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972

F.2d 1272, 1278 (Fed. Cir. 1992).  The Court looks at each claim as a whole and not at the

separate steps contained therein.  *Id.* at 1274 ("[E]ach claim is an *entity* which must be

considered *as a whole*.  It cannot be said . . . that a part of the claim is 'claimed' subject

matter.").  As the *General Foods* court explained:

> [A] claim to a process comprising the step A followed by step B
> followed by step C defines, as a matter of law, only the A–B–C
> process and one cannot properly speak of any single step as being
> "claimed", for it is not; all that is claimed is the process consisting
> of the *combination* of all three steps.  Such a claim, therefore,
> creates no patent right or monopoly in step A, no right to prevent
> others from using step A apart from the combination of steps A–
> B–C.  Step A is not "patented."

*Id.*

Claims 9 and 17 of the '101 Patent claim a two-step method for replicating HIV DNA as

set forth in Figure 4.  Claim 6 of the '949 Patent claims a four-step process for detecting

antibodies to HIV in a human sample.  Abbott asserts that the language of the claims

demonstrates that both the '101 Patent and the '949 Patent claim "a method involving the use of

a unicellular host microorganism that is transformed to recognize an origin of replication

containing at least 21 base pairs of HIV DNA."  Doc. 165 at 12.  It maintains that in order to

---

[12] The two-way test, under which the Court would also consider whether "the patent claims are obvious over the application claims," does not apply here.  *Berg*, 140 F.3d at 1432.  The two-way test is "a narrow exception to the general rule of the one-way test," *id.*, which applies only when "the PTO is solely responsible for the delay in causing the second-filed application to issue prior to the first," *id.* at 1437. This case does not present such circumstances.

practice claim 6 of the '949 Patent, one has to practice the asserted claims of the '101 Patent and that, in 1984, a person of ordinary skill in the art would have known that in order to produce the recombinant technology immunoassay to detect HIV required by claim 6 of the '949 Patent, one would have to molecularly clone HIV.

As Abbott points out, the first step of the '949 Patent's process requires a recombinant polypeptide comprising a portion of HIV DNA. But while some overlap exists in the steps of the remaining asserted claims and a portion of the first step of claim 6 of the '949 Patent, the '949 Patent does not claim the HIV DNA replication method in its entirety. *See Gen. Foods*, 972 F.2d at 1280 (rejecting obviousness-type double patenting defense despite the fact that one of the steps of the earlier patented method "recite[d] the essence of the very same process claimed" in the patent in suit); *Astellas Pharma, Inc. v. Ranbaxy Inc.*, No. CIV.A.05 2563, 2007 WL 576341, at *5 (D.N.J. Feb. 21, 2007) (rejecting obviousness-type double patenting defense where "[i]n order to reach the conclusion that defendants desire, the Court would have to go beyond what is claimed by the two patents and compare the '063 claims with the compounds merely named and not claimed in the '106 patent"); *cf. In re Chaplin*, 711 F. App'x 644, 644 (Fed. Cir. 2018) (affirming PTAB decision finding claims unpatentable based on obviousness-type double patenting where the applicants sought to patent a virus after previously receiving patents with claims directed to the use of the virus and methods for generating the virus); *In re Metoprolol Succinate Patent Litig.*, 494 F.3d 1011, 1019 (Fed. Cir. 2007) (finding obvious a claim on a "compound (A)" in light of "an earlier claim on a composition comprised of compound (A), inner layer (B), and outer layer (C)" where "the composition of the earlier patent claim includes the compound of the later patent claim in its entirety"). And although a person of ordinary skill in the art may have known of the need for molecularly cloned HIV to perform the diagnostic

method claimed in the '949 Patent, Abbott has not sufficiently explained how the specific method claimed in the '101 Patent for replicating HIV DNA as set forth in Figure 4 would have been obvious from the '949 Patent's *claims*, particularly given that the sequence in Figure 4 was not generally known at the time of the inventions. True, the specifications of both patents disclose the HIV DNA sequence of Figure 4, but Abbott cannot use the patents' shared specification to demonstrate obviousness given the doctrine's focus "on preventing a patentee from claiming an obvious variant of what it has previously *claimed*, not what it has previously *disclosed*."[13] *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 689 F.3d 1368, 1379 (Fed. Cir. 2012); *see In re Kaplan*, 789 F.2d 1574, 1580 (Fed. Cir. 1986) (rejecting use of "a disclosure of appellants' own joint invention which had been incorporated in the Kaplan sole disclosure to show that their invention was but an obvious variation of Kaplan's claimed invention"). Here, claim 6 of the '949 Patent does not even mention Figure 4, further highlighting the difference between claims 9 and 17 of the '101 Patent and claim 6 of the '949 Patent.

In sum, Abbott has shown that the two patents are related, but that does not suffice to meet its high burden of showing by clear and convincing evidence that claims 9 and 17 of the

---

[13] The Federal Circuit has recognized that a "reference patent's disclosures of utility" have relevance to the question of obviousness. *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1380–81 (Fed. Cir. 2014). This is particularly so where the specifications disclose only one use for a composition, with one patent claiming the composition and the other claiming the method of using the composition. *See, e.g.*, *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1385–86 (Fed. Cir. 2003) ("The Fleming patent's claim describes a compound, and Fleming's written description discloses a single utility of that compound as administration to a human in amounts effective for inhibiting β-lactamase. The '720 patent claims nothing more than Fleming's disclosed utility as a method of using the Fleming compound. Thus, the claims of the Fleming and '720 patents are not patentably distinct."). Additionally, the specification may be used to determine "whether the utility of the later patent was unexpected at the time of the earlier patent" where the patentee argues that "a species contained in a previously patented genus" is patentable because "the species manifests unexpected properties or produces unexpected results." *Abbvie*, 764 F.3d at 1380–81. But these factual circumstances are not present in this case, and so the shared specification does not inform the obviousness-type double patenting inquiry.

'101 Patent are invalid for obviousness-type double patenting.[14]  Thus, the Court grants

judgment for Defendants on Abbott's obviousness-type double patenting defense for claims 9

and 17 of the '101 Patent.

## IV.  Infringement

Finally, the Court turns to Abbott's motion for partial summary judgment of non-

infringement and summary judgment of no willfulness.  Abbott first argues that the manufacture

of products outside of the United States prior to the '101 Patent's issuance or during the validity

of the 1996 HIV License does not constitute infringement.  Next, Abbott argues that certain of its

products do not infringe claims 9 and 17 under the doctrine of equivalents.  Third, Abbott

contends that Defendants cannot show willful infringement.  The Court addresses these

arguments in turn.

### A.  Timing and Location of the Manufacture of the Accused Products

Section 271(a) provides that "whoever without authority makes, uses, offers to sell, or

sells any patented invention, within the United States or imports into the United States any

---

[14] In opposing Abbott's request for summary judgment on this issue, Defendants also focus on the fact that the Examiner for the '894 Application, which ultimately issued as the '949 Patent, issued a restriction and species election requirement, identifying the claims of the '949 Patent and the '101 Patent as separate inventions.  While this suggests that "the examiner thought that there were 'two or more independent and distinct inventions' claimed in a single application," such "[r]estriction requirements are discretionary decisions, primarily for administrative convenience, and do not represent a final determination that the relevant claims are patentably distinct."  *Biogen MA, Inc. v. Japanese Found. for Cancer Rsch.*, 785 F.3d 648, 659 (Fed. Cir. 2015).

Additionally, Defendants set forth secondary considerations that they maintain preclude Abbott's request for summary judgment.  Obviousness-type double patenting does not require inquiry into secondary considerations, but "when offered, such evidence should be considered."  *Teva*, 689 F.3d at 1381.  Here, the Court agrees with Defendants that Abbott's continued payment of royalties under the 1996 HIV License after the '949 Patent expired undermines Abbott's obviousness-type double patenting defense.  *See Gen. Foods*, 972 F.2d 1272, 1279 (Fed. Cir. 1992) ("It has to be considered a bit odd that after enjoying the benefits of a license to use the principal invention which caused it to take a license in 1978—the *decaffeination process* which it knew was not yet patented, not the caffeine recovery 'improvement' which it no longer wishes to use—and although fully informed about the prosecution of the patent on that decaffeination invention, it comes up with the contention a decade later that that patent is invalid and files the present declaratory judgment suit in 1988 to test its theory.").

patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). "[A] method or process claim is directly infringed only when the process is performed." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1360 (Fed. Cir. 2007); *see also Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773–74 (Fed. Cir. 1993) (sale of equipment "capable of performing the claims process" does not amount to direct infringement of the process).

Abbott first argues that Defendants cannot establish that the majority of Abbott's Accused Products resulted from any infringing activity because Abbott performed the accused methods outside of the United States or at a time when their practice could not have infringed the '101 Patent. Abbott contends that Defendants have not sufficiently established when or where Abbott performed the accused methods used in the Accused Products, and so the Court should grant it summary judgment and find that Accused Manufacturing Steps that occurred outside of the United States and/or before the termination of the 1996 HIV License do not infringe. Defendants respond that they "agree with the uncontroversial proposition that in order to infringe a method claim, the method must be performed within the United States and must be performed after the patent issues." Doc. 173 at 6. But Defendants argue that the evidence at trial will demonstrate that each of the Accused Products incorporates infringing antigens.

Given the parties' general agreement on the basic fact that Defendants can only recover for the performance of the accused methods in the United States after the issuance of the patent, as well as the fact that the Court has substantially narrowed the claims on which Defendants can proceed in this Opinion, the Court defers ruling on whether Defendants can recover for each specific Accused Product. This question requires a much more fulsome presentation than that provided by either side at summary judgment, with Defendants ultimately having to show that

the sales of Accused Products for which they seek recovery incorporated Accused Manufacturing

Steps that took place in the United States and during the relevant time. The Court here addresses

only whether Accused Products that incorporate Accused Manufacturing Steps performed during

the term of the 1996 HIV License may infringe claims 9 and 17 of the '101 Patent.

Section 271(a) requires that the infringing method have been practiced "without

authority." 35 U.S.C. § 271(a). Abbott argues that its performance of any of the Accused

Manufacturing Steps during the term of the 1996 HIV License cannot infringe the '101 Patent,

regardless of whether Abbott later sold products that incorporated the Accused Manufacturing

Steps after the license terminated. Defendants disagree, arguing that the 1996 HIV License did

not encompass Accused Manufacturing Steps.

The 1996 HIV License provided Abbott with the right to "make, have made, use, import,

offer for sale and sell Licensed Products in the Field." Doc. 155 ¶ 14. It defined "Licensed

Products" as "Products the making, having made, using, importing, offering for sale, or selling of

which, but for the license granted hereunder, would infringe a Valid Claim of a patent included

within Licensed Patents," including the '101 Patent. *Id.* ¶ 16. "Products" included "reagents,

compositions or kits suitable for use in carrying out a diagnostic assay." *Id.* ¶ 17. Here,

Defendants accuse Abbott of infringing claims 9 and 17 by performing Accused Manufacturing

Steps, which it has used to make the Accused Products. Despite Defendants' arguments to the

contrary, a plain reading of the 1996 HIV License indicates that it covered Abbott's performance

of Accused Manufacturing Steps intended for use in the making of Licensed Products.[15] Thus,

---

[15] The Court interprets the 1996 HIV License under California contract law, which the parties chose to govern the license agreement. *See Tex. Instruments Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1329 (Fed. Cir. 2000) (applying California state law, which parties chose in their license agreement, to interpret a patent license agreement). Under California law, "[w]hen interpreting a contract provision, a court gives the contract terms their ordinary and popular meaning unless the contracting parties use them in a technical or a special sense." *Id.*

43

because direct infringement of method claims occurs "only when the process is performed,"
*Monsanto*, 503 F.3d at 1360, the subsequent use of Accused Manufacturing Steps in products
sold after the 1996 HIV License terminated cannot qualify as infringing activity.  Although
Defendants complain that this reading is nonsensical because it allows Abbott to stockpile
Accused Manufacturing Steps and then terminate the license without paying any royalties to
Defendants, the parties chose to structure their license in this way.  *See Tex. Instruments*, 231
F.3d at 1329–30 (noting that the parties to a license agreement were "sophisticated corporations
with experience in patent licensing" and so "would have negotiated the clauses of the patent
license agreement with knowledge of patent law").  Thus, while Defendants may now be
unhappy with the terms of the 1996 HIV License, such unhappiness does not provide a basis to
find that Abbott's performance of Accused Manufacturing Steps while the 1996 HIV License
was in effect constitutes an infringing act.  Instead, the Court concludes that Defendants cannot
recover for any Accused Products that incorporate only Accused Manufacturing Steps performed
during the term of the 1996 HIV License.  In other words, to the extent Defendants establish
infringement of claims 9 and 17, they can only recover for those Accused Products that
incorporate Accused Manufacturing Steps that took place in the United States after the
termination of the 1996 HIV License.

> **B.** **Doctrine of Equivalents**

Defendants claim that certain of Abbott's manufactured antigens (rpGO-11CKS, rpGO-
9CK, HIV-1 rpCKS41, and rp41 HLH-M) infringe claims 9 and 17 under the doctrine of
equivalents.  For an accused product to infringe under the doctrine of equivalents, "any
differences between the claimed invention and the accused product must be insubstantial."
*Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1346 (Fed. Cir. 2013).  The

44

doctrine of equivalents applies limitation by limitation, with the Court examining whether the accused product "performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009). Although infringement under the doctrine of equivalents is typically a factual question, where "the evidence is such that no reasonable jury could determine two elements to be equivalent," summary judgment is proper. *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997)).

Claims 9 and 17 require the replicated HIV DNA sequence to comprise "at least a 20 bp sequence" where that sequence is a env sequence of Figure 4. '101 Pat. at 75:61–62, 76:17–18, 76:55–57. The four accused antigens at issue here do not have twenty consecutive base pairs that match any twenty consecutive base pairs in the envelope region of Figure 4, but they do have seven consecutive amino acids that match seven consecutive amino acids in the envelope region of Figure 4. Defendants maintain that the amino acid match satisfies the doctrine of equivalents, while Abbott contends that Defendants' argument vitiates the twenty base pair claim limitation and is precluded by prosecution history estoppel.

"Under the doctrine of equivalents, an infringement theory . . . fails if it renders a claim limitation inconsequential or ineffective." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016). In other words, "[a] claim term is vitiated when the proposed equivalency 'embrace[s] a structure that is specifically excluded from the scope of the claims.'" *United Access Techs., LLC v. AT&T Corp.*, No. 2021-2002, 2022 WL 1124961, at *5 (Fed. Cir. Apr. 15, 2022) (alteration in original) (quoting *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1582 (Fed. Cir. 1996)); *see also Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, 998

F.3d 917, 924 (Fed. Cir. 2021) ("Vitation has its clearest application 'where the accused device contain[s] the antithesis of the claimed structure.'" (alteration in original) (quoting *Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1345 (Fed. Cir. 2006))).

Here, "a reasonable juror could find that the accused products perform substantially the same function, in substantially the same way, achieving substantially the same result as the claims." *Edgewell*, 998 F.3d at 924. Abbott focuses on the fact that the inventors chose to require a match with base pairs in the Figure 4 sequence instead of claiming the amino acid sequence disclosed in the same figure, pointing out that, in other related patents, the inventors claimed sequences of amino acids instead of nucleotides and so could have done the same for claims 9 and 17. But Abbott fails to explain why using amino acid sequences would render the claim limitation meaningless, where the same protein is generated using either the underlying base pair sequences as set forth in Figure 4 or the amino acid sequences encoded therein. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002) ("The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes."). In other words, Abbott has not definitively shown that the Accused Products' use of amino acid sequences embraces a structure that was specifically excluded from claims 9 and 17 by the inventors' choice to use nucleotide, and not amino acid, sequences in the claim language, creating at least a question of fact as to vitiation. *Cf. Brilliant Instruments*, 707 F.3d at 1347 ("The vitiation test cannot be satisfied merely by noting that the equivalent substitute is outside the claimed limitations' literal scope.").

That does not necessarily mean that the question goes to a jury, however, because Abbott also argues that Defendants cannot rely on the doctrine of equivalents based on prosecution

history estoppel. *AquaTex Indus., Inc. v. Techniche Sols.*, 419 F.3d 1374, 1382 (Fed. Cir. 2005).

Prosecution history estoppel applies "when the [patentee] makes a narrowing amendment for

purposes of patentability, or clearly and unmistakably surrenders subject matter by arguments

made to the examiner." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1344 (Fed. Cir. 2005).

Abbott invokes argument-based estoppel, which requires the prosecution history to "evince a

clear and unmistakable surrender of subject matter." *AquaTex*, 419 F.3d at 1382 (quoting

*Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 170 F.3d 1373, 1377 (Fed. Cir. 1999)). "The

relevant inquiry is whether a competitor would reasonably believe that the applicant had

surrendered the relevant subject matter." *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d

1349, 1364 (Fed. Cir. 2006) (citation omitted).

Abbott points to a March 3, 1999 submission in which the applicants stated in response to

an obviousness rejection that "even if *arguendo* the amino acid sequences of ARV-2 proteins

were similar to those of HTLV-I proteins, nucleotide sequences which encode the ARV-2

proteins, which are required to practice Applicants' claimed method, are not obvious as a matter

of law." Doc. 152 ¶ 30. Abbott argues that this statement by the applicants "highlight[ed] the

lack of equivalence between a sequence of nucleotides and a sequence of amino acids." Doc.

151 at 19. Defendants respond that Abbott takes this sentence out of context, as it was made in

response to a rejection over prior art that did not include any amino acid or nucleotide sequences

of HIV. But "[w]here a patent applicant sets forth multiple bases to distinguish between its

invention and the cited prior art, the separate arguments [can] create separate estoppels as long as

the prior art was not distinguished based on the combination of these various grounds." *Amgen*

*Inc. v. Coherus BioSciences Inc.*, 931 F.3d 1154, 1160 (Fed. Cir. 2019) (second alteration in

original) (citation omitted). While the applicants did set forth several reasons to distinguish the

47

prior art, they did not rely only on the combination of those grounds, instead making it clear that even assuming the other grounds did not apply, the fact that nucleotide sequences, as opposed to amino acid sequences, were required to practice the method and were not obvious over the prior art provided a basis for allowing their claims. *Id.* at 1160–61 (prosecution history estoppel applied to one ground asserted to overcome prior art regardless of other arguments that the applicant made). Because the applicants thus disclaimed the use of amino acid sequences in place of nucleotide sequences in the '101 Patent, Defendants cannot rely on the doctrine of equivalents to show that Abbott infringes claims 9 and 17 in producing the rpGO-11CKS, rpGO-9CK, HIV-1 rpCKS41, and rp41 HLH-M antigens. The Court thus grants summary judgment for Abbott on this question.

### C.  Willful Infringement

To establish willfulness, Defendants must show that Abbott "had a specific intent to infringe at the time of the challenged conduct." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021). "The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016). The willfulness inquiry considers whether Abbott's actions can be characterized as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* at 103–04. Willfulness is a question of fact that Defendants must demonstrate by a preponderance of the evidence. *Bayer*, 989 F.3d at 987.

Abbott argues that no jury could find that it engaged in willful behavior because, prior to terminating the 1996 HIV License, it explained its positions regarding the '101 Patent to Grifols and promptly filed this declaratory judgment action. Defendants, on the other hand, maintain

that the fact that Abbott stopped paying royalties under the 1996 HIV License on March 31, 2018 and then waited a number of months to provide Defendants with the basis for this decision demonstrates willfulness. Defendants further argue that Abbott cannot rely on an opinion of counsel defense to demonstrate non-willfulness because Abbott did not properly disclose such information and has not shown that it relied on counsel's opinion.

The parties' differing views on the facts highlight that the question of willfulness remains one for the jury. As Defendants point out, a reasonable jury could find that, although Abbott only officially terminated the 1996 HIV License in November 2019, after it filed this lawsuit seeking a declaration of invalidity, its decision to stop paying royalties under the 1996 HIV License in March 2018, without communicating any basis for this decision to Defendants until months later, indicates willfulness. In other words, a jury could find that Abbott understood the infringing character of its actions because it paid royalties to Grifols under the 1996 HIV License for over ten years after the '101 Patent issued and eight years after the '949 Patent expired. A jury could find Abbott's subsequent explanation for its decision to stop paying royalties, that the '101 Patent was invalid and that Abbott did not practice its claims, amounts to a post hoc rationalization in an attempt to avoid a willfulness finding. On the other hand, a jury could conclude that Abbott took these steps in good faith, with the explanations for its decision not to continue paying royalties and even the institution of this action seeking a declaration of invalidity occurring before Abbott officially terminated the 1996 HIV License and thus began its allegedly infringing conduct.[16] Because a dispute exists, the Court must submit the question of willful infringement to the jury.

_____

[16] Defendants also complain that Abbott improperly seeks to use an advice of counsel defense to defeat a finding of willfulness. Defendants contend that, in order to rely on advice of counsel, Abbott needed to disclose the internal audit on which it relied to determine that it did not practice the '101 Patent's claims. *See RTC Indus., Inc. v. Fasteners for Retail, Inc.*, No. 17 C 3595, 2020 WL 1148813, at *5 (N.D. Ill. Mar.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion for partial summary judgment of validity under 35 U.S.C. § 101 [134] and enters judgment for Defendants on Abbott's claim for declaratory judgment of invalidity under 35 U.S.C. § 101 and Abbott's patent ineligibility defense.  The Court grants in part and denies in part Abbott's motion for summary judgment of invalidity [142].  The Court finds that claims 1, 3, 7, and 10 of the '101 Patent are invalid for lack of written description and as anticipated under § 102 and enters judgment for Abbott with respect to claims 1, 3, 7, and 10 of the '101 Patent.  The Court grants Defendants' motion for partial summary judgment of no invalidity on obviousness-type double patenting [127] as to claims 9 and 17 of the '101 Patent and denies it as moot as to the remaining asserted claims.  The Court enters judgment for Defendants on Abbott's obviousness-type double patenting defense for claims 9 and 17 of the '101 Patent.  The Court grants in part and denies in part Abbott's motion for partial summary judgment of non-infringement and summary judgment of no willfulness [150].  To the extent Defendants establish infringement of claims 9 and 17, they can only recover for those Accused Products that incorporate Accused Manufacturing Steps that took place in the United States after November 2, 2019.  The Court enters judgment for Abbott

---

9, 2020) ("In the patent context, for instance, an accused infringer who relies upon an opinion of counsel (as a sword) to defend against a charge of willful infringement is prevented from at the same time using the attorney-client privilege (as a shield) to withhold other communications relating to the same subject matter.").  Abbott, however, maintains that its willfulness argument does not rely on an opinion of counsel defense, with it instead only using the exchanges between its and Grifols' counsel to show that it engaged with Grifols in good faith prior to committing an allegedly infringing act.  To the extent that Defendants believed that Abbott did not comply with its discovery obligations on this issue, they should have sought a ruling from the Court during the pendency of discovery.  Because the parties appear to have fundamentally different understandings of the inferences that can be drawn from the facts underlying the willfulness question and the Court finds the issue must go to the jury, the Court will entertain the question of whether to reopen discovery to allow Defendants to obtain further information as to the underlying basis for Abbott's decision to stop paying royalties and terminate the 1996 HIV License.

that the rpGO-11CKS, rpGO-9CK, HIV-1 rpCKS41, and rp41 HLH-M antigens do not infringe claims 9 and 17 of the '101 Patent under the doctrine of equivalents.

Dated: September 20, 2023

_____

SARA L. ELLIS
United States District Judge